OPINION
Michael Cavender ("Father") appeals the determination of the Madison County Court of Common Pleas, Juvenile Division, granting permanent custody of his son, Michael Cavender ("Michael"), to the Madison County Department of Children's Services ("MCDCS"). We affirm the trial court's award of permanent custody to the agency.
Father and Sylvia Cavender ("Mother") were married in 1990. Melinda, Michael's sister, was born to the couple on July 7, 1990. Michael was born to the couple on January 19, 1992. After Mother and Father divorced in 1996, Father did not visit on a regular basis; Father saw Michael only three to four times over a two-year period. By the time he was six years old, Michael displayed extreme behavioral problems.
On October 9, 1998, MCDCS filed a complaint alleging Michael was a dependent child. During the dependency adjudication,[1] the trial court heard evidence that Michael displayed such aberrant behavior as jumping out of a second-story window; taking his mother's boyfriend's van and driving it into a tree; engaging in self-mutilation; urinating on other children; pulling down his pants in front of adults; defecating on beds; biting and kicking; and cursing and using language not typically associated with children his age.
In the dependency hearing, Mother admitted that she could not handle Michael's behavioral problems, admitted his dependency, and requested that temporary custody be granted to MCDCS. Mother alleged in the hearing that Father had behaved inappropriately, dumping a bowl of oatmeal on Michael's head and acting cruelly in front of the children. Mother also alleged that Father had killed the family puppy because the puppy had bitten Father while he attempted to have sex with it. In an order dated November 3, 1998, the court found that Michael was a dependent child and granted MCDCS temporary custody. Melinda remained in Mother's custody.
In July 1998, Michael was placed in the foster home of Claudia Whitis, who had been specially trained to act as foster parent for challenging children. When Michael arrived in Whitis' foster home, he displayed such aberrant behavior as sexually acting out and self-mutilation. He was angry and aggressive, and he could not follow simple directions. At the age of seven, Michael was diagnosed with attention deficit/hyperactivity disorder ("ADHD"), obsessive-compulsive disorder ("OCD"), and several other psychiatric disorders. In addition, Michael functioned in the mild to moderate range of mental retardation. He demonstrated severe cognitive delays, as well as serious delays in verbal skills and all academic skills. Whitis found Michael a very difficult child to control.
Michael was placed on medication to control the ADHD, and he began a special educational program for children with multiple handicaps who could not be taught in regular classrooms due to severe disabilities. Since Michael could not respond to people appropriately and became "out of control" with change, he required a strictly structured classroom to do well. Like Whitis, Michael's teacher, Margaret VanHoose, found Michael a difficult child to manage. Nonetheless, according to Whitis and VanHoose, Michael's behavioral problems began to improve with the special education program and a structured home environment.
On September 17, 1999, MCDHS filed its first Motion for Permanent Custody of Michael. The court scheduled a permanent custody hearing for November 16, 1999. Before the hearing, however, Father expressed an interest in renewing contact with Michael. As a result, the agency withdrew its motion for permanent custody in order to give Father six months to establish his interest in acting as Michael's parent and to work on the agency's case plan. The previously-scheduled permanent custody hearing was changed to a review hearing.
In the November 1999 review hearing, the court apprised Father that he would be required to complete the agency's case plan. That plan included Father's completion of a psychological assessment, in addition to a parenting assessment that Dr. Melissa Layman-Guadalupe had completed in August 1998. Father's live-in girlfriend, Brenda Bonecutter, was also required to complete a psychological assessment. In addition, the case plan included the agency's recommendation that Father and Bonecutter establish and maintain regular supervised visitation with Michael.
Dr. Guadalupe attempted to contact both Father and Bonecutter to complete psychological assessments. Father appeared for one appointment, but did not appear for two additional scheduled appointments and he never completed the assessment. The results of Father's personality tests indicated he presented himself in an overly positive light, and Dr. Guadalupe believed that there was something Father did not acknowledge. Dr. Guadalupe was concerned that Father's failure to appear for the additional appointments reflected his parenting limitations, and she felt that he did not understand Michael's significant behavioral problems. Bonecutter, whose own children had been involved with the Franklin County Children Services agency, refused to complete the psychological assessment, stating that she was not Michael's parent and would not take care of him if he came to live with them.
Father and Bonecutter did, however, complete parenting classes taught by parenting educator Sue McClelland. Although Bonecutter always appeared for class, she told McClelland that Michael was not her child and she would neither take care of him nor discipline him. Father conveyed to McClelland that he did not think Michael needed the ADHD medication and said he would not give it to him.
Father began visitation with Michael in November 1999. Once father began to see Michael, Michael's behavioral problems escalated. Both Whitis and VanHoose indicated that Michael, who had been doing better, began to become more agitated. After Father missed scheduled visits, Michael became even more agitated. He began to engage in behavior that had stopped for almost a year, such as urinating and defecating in his bedroom. Michael also began again to engage in self-mutilation, and told Whitis that he did so because of his Father. Since Michael's behavior escalated in anticipation of his scheduled visits with Father, Whitis attributed it to Father's visits.
Michael's behavior at school also began to deteriorate in November 1999, once his visits with Father began. VanHoose noticed that Michael's aberrant behavior escalated out of control. He did not care about behaving well, as he had before. In addition, Michael began to engage in dangerous behavior such as hurting himself, throwing objects and classroom furniture, and threatening other children with death. At one point, Michael even locked VanHoose out of the classroom. Michael also became visibly more nervous and could not focus on class work.
Not only did Whitis notice that Michael's aberrant behavior escalated with Father's resumed visitation, but she had serious concerns about father's ability to parent Michael effectively. Whitis noted that, on one occasion, Father had dumped a bowl of oatmeal on Michael's head, stating that if the child would not eat it, he would wear it. Father also had to be repeatedly told about Michael's allergies. Moreover, Bonecutter's children, who also lived with Father, repeatedly cursed and acted inappropriately in front of Michael. Bonecutter herself apparently told Father to get "that damn brat," meaning Michael, out of the home on one occasion.
McClelland also expressed concerns about Father's ability to parent Michael. She observed Father and Bonecutter visit with Michael on one occasion. During that visit, Father asked inappropriate questions of Michael, and McClelland saw that Michael's agitated behavior escalated throughout the visit. McClelland felt that Father and Bonecutter were limited in their ability to understand and follow through with the parenting education.
From November 1999 through March 2000, Father missed two of five scheduled visits with Michael. MCDCS filed a second Motion for Permanent Custody of Michael on March 7, 2000. On April 7, 2000, and May 3, 2000, the trial court held hearings on the motion. The trial court heard testimony from Claudia Whitis, Dr. Guadalupe, VanHoose, social workers, and a counselor, all of whom had had substantial involvement with Michael. All agreed that Michael was a child who demanded substantial attention and parenting skill, and who would require a strictly structured environment and special effort years into the future. They also agreed that Michael's behavior had deteriorated upon contact with Father, and Father did not have the skill necessary to manage Michael or to provide for his special needs.
The court also heard testimony from Mother, Father, and Bonecutter. Mother agreed that the agency should have permanent custody of Michael. While admitting that he did not have the skills to take custody of Michael in the foreseeable future, Father requested that the court establish permanent long-term foster care in lieu of granting the agency permanent custody. At the conclusion of the hearing, the court granted permanent custody to MCDCS. Father now appeals the trial court's ruling.
Assignment of Error No. 1:
 THE TRIAL COURT ERRED BY OVERRULING THE APPELANT'S MOTION TO DISMISS CITING THE STATE'S FAILURE TO COMPLY WITH SECTION 2151.413(E) OF THE OHIO REVISED CODE.
In this assignment of error, Father alleges that the trial court should have dismissed the agency's motion for permanent custody since the agency did not file an adoption plan for Michael as it was required to do pursuant to R.C. 2151.413(E). The agency responds that R.C. 2151.413(E) does not require it to file an adoption plan before permanent custody is granted.
R.C. 2151.413(E) reads:
 Any agency that files a motion for permanent custody under this section shall include in the case plan of the child who is the subject of the motion, a specific plan of the agency's actions to seek an adoptive family for the child and to prepare the child for adoption.
The Fifth District Court of Appeals addressed the issue Father raises in In re McCutchen (Mar. 8, 1991), 1991 WL 34881, at *4, Knox App. No. 90-CA-25. In that case, the agency did not file an adoption plan until the court had granted permanent custody. Id. Mother argued that the agency violated R.C. 2151.413(E) by failing to file the adoption plan before permanent custody was granted. Id. The court of appeals looked to the language of R.C. 2151.413(E) to determine that the statute did not specify the time at which an adoption plan must be filed, although it did require the agency to file a plan. Id.
In its ruling, the court noted that a substantive change to a case plan could only be made by agreement of all parties or after a hearing, and requiring the agency to amend the case plan to add an adoption plan before parental rights were terminated would undermine the agency's efforts to reunify the family. McCutchen, 1991 WL 34881 at *4. For this reason, the court determined that the agency was not required to file an adoption plan before the court granted permanent custody. Id.
We agree with the Fifth District Court of Appeals. R.C. 2151.413(E) does not require the agency to file an adoption plan either at any specific time or before permanent custody is granted. Here, the agency did not file an adoption plan at any point in these proceedings. While MCDCS social workers testified that Michael was an adoptable child, social worker Sharon Manion explained that the agency's original goal was the family's reunification, and it would not seek an adoptive home for Michael until permanent custody had been granted.
Indeed, before permanent custody is granted, the agency cannot know whether adoption is a viable option. Requiring the agency to file an adoption plan before Father's parental rights were terminated would have undermined the agency's reunification efforts and caused additional work that may have been rendered moot had permanent custody been denied. Moreover, as the trial court pointed out in denying Father's motion to dismiss, requiring a court to dismiss a motion for permanent custody when the agency has not filed an adoption plan places procedure over the child's best interests.
The trial court did not err when it denied Father's motion to dismiss the permanent custody motion because the agency did not file an adoption plan before termination of Father's parental rights. Father's first assignment of error is overruled.
Assignment of Error No. 2:
 THE TRIAL COURT ERRED IN GRANTING THE STATE'S MOTION FOR PERMANENT CUSTODY, SUCH DECISION BEING AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Father contends that the court improvidently granted the agency permanent custody of Michael when that finding was not supported by clear and convincing evidence. The agency responds that the trial court's grant of permanent custody is grounded firmly upon clear and convincing evidence.
When granting a motion for permanent custody, the trial court is required to make specific statutory findings. See In re William S. (1996), 75 Ohio St.3d 95, syllabus. A reviewing court must determine whether the trial court followed the statutory factors in making its decision or abused its discretion by deviating from the statutory factors. Id.
A court may terminate parental rights and grant permanent custody of a child to an agency if the agency meets a two-pronged test. See In reEgbert Children (1994), 99 Ohio App.3d 492; R.C. 2151.414. When a state agency moves for permanent custody, the trial court is required first to determine "if it is in the best interest of the child to permanently terminate parental rights and grant permanent custody to the agency that filed the motion." R.C. 2151.414(A)(1). In making the best interest determination, the trial court must consider all relevant factors, including but not limited to the following factors enumerated in R.C.2151.414(D):
 (1) The interaction and inter-relationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 (5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
The agency must show by clear and convincing evidence that a grant of permanent custody is in the best interest of the child. R.C.2151.414(B)(1). Clear and convincing evidence is that evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Cross v. Ledford
(1954), 161 Ohio St. 469, paragraph three of the syllabus.
In its May 26, 2000 order granting permanent custody, the court made specific findings relating to each of the R.C. 2151.414(D) factors. In making its best interest finding, the court considered Michael's interaction with Father; Michael's wishes as expressed through the guardian ad litem; his custodial history; and his need for legally secure placement. The court heard substantial evidence from Michael's foster parent, social workers, counselor, teacher, and guardian ad litem in assessing each of the statutory best interest factors.
The court noted that Michael's interaction with his parents was such that he could not live with either. Indeed, the evidence showed that Michael's aberrant behavior increased with contact with Father. The court specifically found that Michael's age and condition made it imperative that he be placed in a legally secure permanent placement that could not be achieved without a grant of permanent custody to the agency.
Contrary to Father's claim that the weight of the evidence does not support this finding, all of the witnesses, who had substantial training and interaction with Michael, testified that permanent custody was in Michael's best interest. There is no evidence contrary to the court's finding that permanent custody was in Michael's best interest. The court's best interest finding is supported by clear and convincing evidence.
In addition to determining the child's best interest, however, the court must make a second determination before granting permanent custody: it must determine whether the child can be placed with a parent within a reasonable time or should not be placed with the parent. R.C.2151.414(B)(1)(a). The court is required to enter a finding that the child cannot be placed with a parent within a reasonable time if any factors set forth in R.C. 2151.414(E) apply, including the following:
 (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
* * *
 (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.
The court in the present case specifically enumerated R.C. 2151.414(E)(1) and (4) as applicable to Father and set forth the facts that supported its findings.
The trial court specifically found that, following Michael's placement outside the home, Father had failed continuously and repeatedly to remedy the problems that initially caused Michael's placement, although he had been provided the services by which to do so. Indeed, the evidence showed that Father and Bonecutter had completed parenting training, but they did not have the capacity to carry out that training. Bonecutter demonstrated unwillingness to parent Michael, and Father had refused to give Michael needed medication and continued to act inappropriately with Michael. Several of the witnesses expressed the opinion that Father did not have the capacity or the skills to give Michael the attention and care his condition demands.
The trial court also specifically found that Father had demonstrated a lack of commitment toward Michael by failing to regularly support, visit, or communicate with the child. The evidence showed that Father had seen Michael only three to four times during a two-year period. Even after the agency provided Father with visitation beginning in November 1999, Father missed two of five scheduled visits. Moreover, neither Father nor Bonecutter had demonstrated willingness to complete the agency's case plan by following through with psychological evaluations.
The court's determination that Michael could not be placed with Father within a reasonable time is supported by clear and convincing evidence. Likewise, the court's best interest determination is supported by clear and convincing evidence. We find no abuse of discretion by the trial court in its application of R.C. 2151.414. Accordingly, Father's second assignment of error is overruled.
Assignment of Error No. 3:
 THE TRIAL COURT ERRED IN ITS RELIANCE UPON EVIDENCE ADDUCED FROM A PRIOR DEPENDENCY ADJUDICATION.
Father claims that the trial court improperly relied upon evidence presented at the hearing in which Michael was adjudicated a dependent child, and the court's reliance on evidence elicited during that hearing, for which Father was not present, amounts to an impermissible readjudiciation of Michael's dependency. The agency responds that the trial court could take into account evidence elicited in the dependency hearing, of which it took judicial notice, and Father missed his opportunity to contest that evidence by failing to appear.
Without pointing to the trial court's specific findings of fact, Father makes ill-defined assertions that the trial court based some of its findings in the permanent custody determination on statements Mother made when she testified at the dependency hearing. The trial court took judicial notice of the previous hearings in this case. Under Evid.R. 201(C), a trial court may take judicial notice of its own proceedings in the immediate cause under consideration. In re Knotts (1996),109 Ohio App.3d 267, 271; see, also, Diversified Mortgage Investors,Inc. v. Athens County Board of Revision (1982), 7 Ohio App.3d 157.
Although a transcript of the October 1998 hearing in which Michael was adjudicated a dependent child is not included in the record, we find that the trial court could properly take judicial notice of the hearing and consider the evidence elicited there when making its permanent custody determination. The dependency adjudication, filed under the same case number as the motion for permanent custody, is part and parcel of the immediate cause under consideration. Indeed, it was necessary for the court to look at Michael's adjudication as a dependent child. Only after a dependency determination has been made must the trial court consider the agency's request for permanent custody and determine if it is appropriate. See In re Pitts (1987), 38 Ohio App.3d 1, 4.
Moreover, testimony elicited at the dependency adjudication hearing was essential to the trial court's understanding of Father's involvement in the case. See In re Baby Boy Eddy (Nov. 12, 1999), 1999 WL 1071641, at *3, Fairfield App. No. 99-CA-17 (court could consider history of case in making permanent custody determination). Since Michael's dependency adjudication is part of the immediate cause, it is both relevant and indispensable to the court's consideration. See id. The trial court properly considered evidence elicited in Michael's dependency adjudication when determining whether MCDCS should be granted permanent custody.
Father contends, however, that the court's consideration of this evidence amounts to a "readjudication" of its previous determination that Michael was a dependent child, in violation of R.C. 2151.414(A)(1). That statute states, in relevant part:
 The court shall conduct a hearing in accordance with section 2151.35 of the Revised Code to determine if it is in the best interest of the child to permanently terminate parental rights and grant permanent custody to the agency that filed the motion. The adjudication that the child is an abused, neglected, or dependent child and any dispositional order that has been issued in the case under section 2151.353 [2151.35.3] of the Revised Code pursuant to the adjudication shall not be readjudicated at the hearing and shall not be affected by a denial of the motion for permanent custody.
A plain reading of the statute's language reveals that during the dispositional phase of a hearing on a motion for permanent custody the court shall not readjudicate a previous finding that the child who is the subject of that case was dependent, abused, or neglected. In the Matterof Charnina J. (Feb. 25, 2000), 2000 WL 216621, at *4, Lucas App. No. L-99-1250.[2] The issue in this case is what constitutes the "readjudication" of a previous dependency finding, which is prohibited by R.C. 2151.414(A)(1).
In order to initially adjudicate a child a "dependent child," a court must find, by clear and convincing evidence, that the child meets the definition in R.C. 2151.04. Therefore, the issue at the adjudicatory phase of the proceedings is whether the agency has proven that the child is a dependent child. In re Baxter (1985), 17 Ohio St.3d 229, 233. The focus of a charge that a child is dependent is on the child and his conditions and not on parental or custodial blameworthiness. Pitts,38 Ohio App.3d at 3, citing In re Bibb (1980), 70 Ohio App.2d 117. Thus, in order to "readjudicate" a dependency finding, the court must, for a second time, focus upon whether the child is receiving proper care and find that the child meets the definition of a "dependent child" in R.C.2151.04.
Here, the court initially adjudicated Michael a dependent child in November 1998. It appears from the trial court's order granting permanent custody that evidence elicited in the dependency hearing duplicated much of the evidence elicited in the permanent custody hearing. However, the court did not reassess Michael's status as a dependent child as defined in R.C. 2151.04 in the permanent custody hearing. While the court may have considered evidence elicited in Michael's dependency adjudication, the trial court assessed the statutory requirements for granting permanent custody pursuant to R.C. 2151.414, that is, whether permanent custody was in Michael's best interest and whether he could be placed with Father within a reasonable period of time.
In making its determination pursuant to R.C. 2151.414, the trial court took into account all of the relevant evidence before determining that the statutory antecedents for permanent custody had been met. The trial court could consider evidence elicited in the dependency hearing in making its determination of permanent custody without engaging in the "readjudication" of Michael's status as a dependent child that is prohibited by R.C. 2151.414(A)(1) in a permanent custody determination.
We also note that Michael's dependency adjudication, which was followed by a temporary award of custody to MCDCS, was a final appealable order.In re Murray (1990), 52 Ohio St.3d 155, 159. Father did not appeal from the dependency adjudication which resulted in a grant of temporary custody in his absence.[3] He cannot now contend that the trial court cannot consider evidence obtained at that hearing.
Accordingly, the trial court properly considered evidence that had been elicited during Michael's dependency hearing when awarding permanent custody to MCDCS. Father's third assignment of error is overruled.
Judgment affirmed.
 ______________ POWELL, J.
YOUNG, P.J., concurs.
VALEN, J., concurs separately.
[1] Although a transcript of the dependency hearing is not included in the record, the trial court recited these facts, which were elicited in that hearing, in its order granting the agency permanent custody.
[2] In Charnina J., the court determined that R.C. 2151.414(A)(1) only applies to cases in which the agency has filed a motion for permanent custody, as opposed to a complaint for permanent custody, so that the statute did not apply to that case. 2000 WL 216621 at *4. Here, the agency filed a motion for permanent custody, and neither party has challenged the statute's application. Therefore, we assume the statute applies in this case to preclude the "readjudication" of Michael's status as a dependent child.
[3] Although Father was absent from the dependency hearing, his attorney was present.